Because you've got Connecticut judges on the bench, we know how to pronounce Berlin. And the town of Versailles, all kinds of pronunciation issues. All right, Council, you've reserved three minutes for rebuttal. Greg Adler from Livingston, Adler, Polda, and Mickel, John, and Kelly in Hartford, Connecticut for the plaintiff. I thought I'd use my time to try to put the district court's decision in context and also in that way touch on the other four legal issues that are raised. So the district court granted summary judgment on the grounds that the town had taken prompt and appropriate remedial action on these four emails that contained sexual harassment content. So I just want to just briefly to put all of that in context. The first email was May 5th, 2013, and the email's in the record at Joint Appendix 122. It starts out making several comments about the plaintiff, including that she has some sort of substance abuse. She has mood swings. She has dress attire that is less than adequate. She's a young lady. And then at the end says, lastly, let's not forget that she was involved in a sex scandal in the town hall with the former zoning officer, Bruce Driska, the same scandal which led Mr. Driska to divorce and resign from the town of Berlin. And then the corrective action was on this one is that the town contacted a detective to begin an investigation and determined that there was no criminal violation from this email and nothing else happened. And then the second email was also in 2013. This one was addressed to the mayor of the town and said, so Helen doesn't get fired for giving head to Bruce, the zoning officer, in town hall property because the town manager, Denise, is screwing the fire marshal while she's on the clock. Of course, she can't be a hypocrite. Counsel, it's helpful for, I'll speak for myself, for you to go through the emails, when they were sent, to whom they were sent. I can assure you that we're familiar with the record. And out of sensitivity to your client, perhaps you may just want to tell us the email and the gist of it. I can do that. That's fine. Unless my colleagues, my fellow judges, wish to get the specifics, I can assure you that it would be helpful to go through the emails and who they were sent to because I think that's critical. I agree. The first email was sent to, the 5113 was sent to the town manager and copied to the mayor. The second email- Was that to their personal emails or their town emails? Well, I think this came as a letter form to the town manager, actually, at the town hall. And I can't tell from this whether this one was sent to the mayor at his official address or his law firm address. The second one, which I was just reading from, was on September 22nd, 2013. That was sent to the town manager at her town address. And then it was copied to the mayor at his law firm address. And the corrective action with respect to the second email was that Ms. Riggins was told that she could have a police officer present when she met with Kokomo. Indeed, there was no contact with Kokomo. There was no sexual harassment investigation. There was no communication otherwise about the sexual content. Third email, which was January 20th, 2017. That was sent to Ms. Riggins at her Berlin address. Also to Jennifer Coppola, who was the town attorney. I think it might have been sent to her law firm address. And that one, again, one of the things I wanted to mention here that I didn't emphasize in the brief was, in addition to the sexual content, these emails are full of sex stereotyping, sex discrimination in terms of the men are called gentlemen, and Ms. Riggins is called the young lady throughout these. The corrective action for this email was that they did it. The detective did an interview of Mr. Van Linter, which was the and it was also sent to him. Sorry. At his Berlin address. Counsel, you have about two minutes left on your item. So I don't mean to cut you off, but there are some questions that I really have to ask you. And I can assure you I'm familiar with the record and the emails. I have two questions. First question, what emails were sent to, because one of the things you complain about is a lack of sort of screening emails and stopping this conduct. What emails, if any, of the ones that you're referring to, communications, were sent to the town email address? In other words, to either board members or employees of the town at their town address. The first email, I mean the second is September 22nd, 2013 for sure. I'm not sure about the first one. This email, this January 20th, 2017 email was sent to town email addresses. The email February 7th, 2017 was sent to town addresses, was also sent to, I'm not sure if it was sent to the individual council members at their personal or their. So we don't know the council members that received it, whether they were received in their personal emails or the town emails. I don't know that. The reason is, I understand your argument that the trial court's decision to grant summary judgment was based on its finding that the town couldn't do more to stop Mr. Coco, I'm not quite sure how to pronounce his name, to stop this sort of pretty egregious, outrageous conduct. The reason I'm asking the question is, if it was sent to the town email, then you have a valid point that the town could have screened his emails, could have done something more to protect the employees. Do you have any indication of that? Yeah, well, this was, at least some of the people on the February 7th email got them at their town email addresses. I can't say for sure whether all the town council members got them at their town email addresses. And the final email was September 11th. And that was the February? 7th, 2017. 2017. And then the September 11th, 2017, was sent to town email addresses, to Mr. Van Linter, who worked for Ms. Rayburn. Yeah, that email was forwarded to Mr. Van Linter. Right, it was originally sent to someone who worked for Mr. Van Linter at his town email address. Was it at the town email? Yes. Okay. And the point, in each of these, and I know I have 50 seconds left, but for each of these, the only response was to figure out whether there was a criminal action that could be taken. So what is your position as to what kinds of things could have been done? So I listed them in the brief, but they could have talked to Mr. First of all, they could have exercised some control over the email. They could have screened the emails. They could have directed the emails to go to human resources. They could have said to all employees, if you get one of these, send them to human resources. They could have instructed all the employees about the commitment to stopping sexual harassment. They could have talked to Mr. Kokomo about his obligation not to engage in sexual harassment. They could have talked to his lawyers about, specifically about not engaging in sexual harassment. But they didn't talk to his lawyer, and he's represented by an attorney. So of the list you had, I believe it's page 34 of your brief, you had a list. Yeah, I had a list. It's in both of those, I think. The one that stuck out to me was sort of screening his emails, official emails. You agree the town can't do anything about him emailing people privately, correct? Correct. They can't stop him, but they could talk to him about it because he's emailing them in their official capacity. But they did talk to his attorney, correct? Not about this. Well, that's an interesting question, Mr. Adler, because this is the tension where the plaintiff complained about his conduct without, and I understand your brief says there's no need for magic words, but didn't say that her concern with the communications was that it was sexually harassing or gender-based. And given his conduct sort of generally, apparently he was abusive to lots of people. There's some, the defendants raised the point that she should have said that. Whether she should have or not, it's then hard to understand how they, is your assertion that they should have just known that the issue that should have been raised with Mr. Kokomo and his counsel was specifically sexual harassment? Yes, because while she didn't use those words, she complained about the sexual content of the emails. She said they were humiliating to her, they were embarrassing to her, and they should do something about it. So the only conversation that occurred was you need to knock off your inappropriate, your client needs to stop acting inappropriately, using inappropriate words towards our employees, generally. Isn't one thing that they could have done is held hearings? Held hearings to determine whether there is abusive conduct being conducted? In other words, this might have, may have been further embarrassing to the plaintiff, but nonetheless it could have had an effect on the defendant. True. And publicize the fact that a person who's in business in the town, who is a contractor, is behaving abusively and improperly towards town employees that might have stopped him. They could have just done, I agree with you, Your Honor. They could have just done an investigation, which I point, in fact, the town has a labor lawyer, a retainer. They didn't talk to him until after the very last email. And then they started an investigation into the sexual harassment investigation after the plaintiff gave her notice. But even if they had done that, I think that would have dissuaded somewhat, or could have dissuaded Mr. Kokomo from continuing. Publicizing his abusive conduct. I agree with you. Very vulgar and obnoxious conduct could have harmed his business. True. And that is, I didn't think of that. And to follow up on that question by Judge LaValle, I understand the town has some restraints about limiting public speech, but someone doesn't have the right necessarily in this type of forum to abuse staff the way this was done, the way this individual did. The town, it seems to me the district court was very concerned about the town's liability. And I understand your argument that this isn't a public forum. It's not the type of public forum speech that would expose the town to liability, and I accept that. I have a different question. In your brief on page three, and then on page 34, you list all the things that should have been done. Or could have been done. One, I have a question about is investigated the concerns raised by the plaintiff under their sexual harassment policy. Could you explain to me specifically what do you mean by that? Because he's not a town employee. Is it just what you mentioned in response to Judge Miriam's question? That sexual harassment exposure or complaint or exposure of liability to this individual for doing this? What does that mean? I'm trying to understand if they did an investigation, why does it have to be an investigation under the sexual harassment policy? Because the conduct was sexual harassment. The policy prohibits sexual harassment of town employees. By town employees or by anyone? It's unclear. It just prohibits sexual harassment. I'm sure it's in the record, but nobody actually looked at the policy. And the human resources director had acknowledged in her deposition that some of this content would be violations of the policy. So investigating whether there's a violation of a policy, the courts have said that is a remedial action that an employer can take. Because if the employer doesn't do an investigation and doesn't look into it, that can be found as evidence of not taking prompt and meaningful corrective action. My point about what I was reading through everything here is not so much, I don't think the legal issue is what are all the things they could have done, because we have a whole list of things they could have done that came up in the oral argument. The question is, is what they did sufficient? And I don't see how you could take that- But part of the test that the courts employ in determining whether the employer, in the context of sexual harassment by a non-employee, customer, or whatever, is whether there was negligence. And negligence in responding to that conduct involves identifying. In fact, the district court's reasoning is that you failed to identify or your client failed to identify the types of actions that could have been undertaken. And that's why we're focused on that. That was actually incorrect. I mean, the district court, I mean, Judge Chotny's was like my favorite. But in the oral argument, he asked that question directly, and I identified virtually all these things that are in the brief. So it wasn't her job as an employee to identify what else could be done. She asked for something to be done. And if you look at what they did, at least a jury should be able to determine that this wasn't sufficient. They didn't address it at all. Thank you. I'm sorry about that. Thank you. All right. You've reserved some time for rebuttal. In the meanwhile, we'll hear from Ms. Foccio. Thank you. May it please the court. My name is Alex Foccio. I represent the town of Berlin. We have five communications from a local builder over the course of four and a half years. He's not an employee. He's not even a patron. He's not a contractor. He is someone who is entitled to have services from the town of Berlin, who was also in active litigation with the town of Berlin, alleging that the town was denying him those services. So that's who we're dealing with. We do not have control over this gentleman. In terms of one of you asked. I do not have control over how he communicates with town employees officially, not personally. If he chooses to send out personal e-mails because he finds someone's personal e-mail, that may be something the town can't control. Maybe they can offer services on, you know, there are ways to screen people out and block people's e-mails. But my question is, is your opponent correct that some of these e-mails went to town employees or council members at their town e-mail addresses? I believe they went to both. So we have the original. So why can't the town then screen those e-mails? So Mr. Van Lintner, I don't know if I'm saying that name correct, or his subordinate would not have received this e-mail. It would have been screened. There wouldn't have been talk around the water cooler about what the question was in that last e-mail, which was humiliating to this plaintiff. I mean, that seems to me a very simple task to do, to limit someone's communication with personnel. You're not blocking access. Well, Your Honor, two things. First of all, there's no evidence as to what the town's capabilities were at this time or currently as to blocking outside external e-mails into or routing them to one particular person. There was no evidence of that, whether or not they even had the ability to do it. But second is- There's no IT? The town doesn't have an IT personnel? There's no discovery on the issue, Your Honor, because it was raised for the first time in argument on a summary judgment motion. So there was no discovery on this, no evidence in the record on it as to what the town had the ability to do. So it's speculation at this point to say the town could have done this, because we don't know. The town can employ a consultant. It doesn't have to have the employees on staff. The town can engage a consultant to help them. What do we do about this? Well, again, we're looking at, the first one's an anonymous letter mailed. Okay? That's not an e-mail at all. The second one, we have an e-mail to the town manager at the business account, mayor at his law firm. Okay? So we're not going to stop that from happening, from getting to the mayor. The third one, it goes to Mr. Van Lintner, the plaintiff, and another attorney at the law firm. Again, not a town address. The fourth one that you were asking about, February 7th, 2017, it is in evidence, and you can tell where it went. And it is at appendix, joint appendix 406. So you can see here that it went to two individuals at their town address. One, two, three, four at their personal address. And copied to a Manny, I don't know how to pronounce his last name, who's another town resident, who's been identified in the record as, again, not a town employee at all, or even affiliated with the town. So my point is a couple things. One is, obviously, we can't control all of this. We can't stop it. If he wants to be heard, he's going to be heard. The second thing is, this is- True, but you can protect your employees from sexual harassment by customers. In this case, he is, or by someone accessing the services. I mean, that happens in public places where somebody's told, look, you have the right to access services, but you don't have the right to sexually harass people or to abuse people or harass employees. And if you do, then your mode of communication will have some limits and some screening. So I guess I'm concerned by the district court's decision, which says, hey, people can talk at town public meetings. We can't stop people from talking. It doesn't seem that this is the kind of forum that he chose to make his vile comments. It seems like he chose a forum that the town could control. Just as they offered a policeman for any face-to-face visits, they could have put in some steps. And why isn't that a question of fact for a jury to decide whether the town acted sufficiently or whether the town was negligent in allowing this repeated sexual harassment? Why wouldn't that go to a jury? Because we're Monday morning quarterbacking as to what could have been the best steps taken. The question really is just not, again, the best approach, but what steps we took were reasonable. And there is evidence, undisputed evidence in the record- What steps were taken other than- and this is not a crime, so they keep asking. And your brief repeatedly says, well, the council told us there was nothing we could do. It's sort of this implied reliance on council argument. But at the end of the day, what did the town really do other than notifying the police repeatedly? What did the town really do to stop this or to attempt to mitigate it in any way? Well, there's certainly evidence in the record of after 2013, him being emailed that these are inappropriate comments. And he basically said- By whom? Mr. Kokomo was emailed by whom? I'll have to find it. It wasn't one of the town manager. It was another employee who he emailed. Someone replied to him, hey, man, this is not okay? Right. So this is not an official act by the town? Agreed. Okay. So what did the town do in response to its employees' distress? So in addition to obviously trying to provide support to the plaintiff directly, Attorney Coppola, who was representing the town at the time, did two things. Multiple things, I should say. One, there was a meeting where Mr. Kokomo himself was present and the attorneys, where she advised all of them that the communications were inappropriate. After that, when she was reading in detail these emails as they were coming in, she had communications and she's testified to this under oath that she spoke to both Attorney Lowry, who initially represented Mr. Kokomo, and then Attorney Case after the February 2017 email and advised them both that these communications were inappropriate and they needed to stop. Again, why aren't we just communicating with Mr. Kokomo directly at that point? Because he is represented by counsel and he's suing the town. So we're having our attorney talk to his attorney and conveying that this is inappropriate. And again, I think it depends on, again, what is reasonable. And we are also telling her, and we do tell her, and the district court judge pointed this out as well, we're also telling her that, frankly, Mr. Kokomo is trying to bait the town. And I would point out that if you look at these communications, I mean, I think, we can't assume for a moment that these are sexual harassment in the sense of he is reporting in these emails, you'll see at least three of them, he's claiming that she was engaged in a sexual relationship on town property with her subordinate. We might not like the way he worded it. Of course, we don't like the way he worded it. But he has a right to report if he believes that someone is... You have the right to report it to counsel. When you read the emails, perhaps I should have your opponent read them into the record. We're familiar with them. How can you argue with a straight face that it's not sexual harassment? The tone, the language he used to describe, and how would a female employee under those circumstances not feel this was sexual harassment? I have a hard time understanding that argument. Well, she never even claimed it was sexual harassment, Your Honor, not once. She complained about defamation. She complained about abusive conduct towards her employees and herself. Never once did she say she thought it was sexual harassment. She was aware of her policy. She was trained on the policy. I mean, she did claim that it was inappropriate conduct and should not... She complained that it was defamation. Yeah, well... And humiliating. And humiliating. But she never reported it as sexual harassment. What difference does that make? Because, Your Honor, I think in part that you have to figure out where the town is coming from in terms of its response, correct? It did not do a sexual harassment investigation because it didn't view this as sexual harassment. The personnel director did not testify that she thought this fell under sexual harassment policy. Perhaps if they got the sexual harassment person involved, they would have identified it as sexual harassment. That's the point your opponent is making, that the town sort of said, Oh, well, you know, that's Mr. Kokomo put up with it. Perhaps if the town was more sensitive to sexual harassment in the workplace, they would have identified it as such. And the plaintiff need not have said, put the label on it. If she complains about it, doesn't an employer have an obligation to investigate it and say, Does this violate any of our policies, including sexual harassment? And the employer did that. And we can sit here and say they might have made a mistake in terms of how they viewed it. But in terms of how they responded, that was reasonable. And all they did was talk to her attorney. Judge Miriam asked you, what steps did the town take? And you identified talking to the attorney, his attorney. And I understand they couldn't speak with him directly if he's represented. But talking to his attorney, and what else? They consulted their town attorney regarding the matter to see if there's anything they could do. They consulted the state police, I'm sorry, the local police to see if they could do anything. And they consulted this assistant state's attorney's office to see if they could do anything. And did they consult the police only after the e-mail was sent to one of the mail employees, correct? No, they had consulted the state police in 2013. So what happened in 2017 was when Attorney Coppola came up, when we found a new town attorney, when she came on board, she herself reviewed all the communications, the history, as did a detective at that point. Because we really had a big gap in space, right? We have a 2013 that's anonymous. So when that comes in, that letter, we don't even know it's from him. It's not until the next e-mail that comes in that Ms. Riggins is telling us, you know, we think it's related, right? Ms. Riggins claimed that her name was misspelled in the same way at the second e-mail and therefore identified him as the source of the anonymous e-mail, correct? Right. And I think we accepted that. I think we accepted that view that once that second e-mail came in, and then they were looked at. Again, she was told to have, bring someone into her room if he comes in the office. She was also, you know, for the record, in terms of where this goes, I mean, here is someone who, this is her department, she's in charge of it, right? She is the town planner and the director of development. And she did not want to give up those responsibilities, and I believe that's in the record as well, in terms of could we go to somebody else? And she took, she owned that. I'll give her credit for that, right? She owned that, that that was her responsibility. You're not suggesting that the town's response to sexual harassment is to remove somebody from their position of authority so that the individual gets to deal with someone of their choice. No, of course not. But to your point of saying, I apologize. To your point of saying having e-mails go somewhere else. She wasn't asking for that, and frankly, you have to remember here, the e-mails for the most part weren't going to her anyway. They were already going to other people. And so, sorry, I apologize. I was sort of suggesting in terms of being directed to somebody else. She wasn't trying to give up her responsibilities of dealing with this frankly disgruntled builder. I know I'm out of time. I would just quickly say it's our position that the judgment can be affirmed on alternative grounds. One, that it's not severe or pervasive, and I'll focus on that one really quick since I'm out. Again, five e-mails or messages, one letter, over the course of four and a half years. You have a three-year block in between them, which I would argue also breaks any continuity between them. This is not a situation where the plaintiff is out of work or not dealing with him on a regular basis. She's dealing with him on a regular basis, and the harassment stopped for that three periods. So we'd argue it's a break. But either way, these are communications where he is claiming that this other gentleman is telling him, right, the person who she allegedly had this relationship with, is telling him that this relationship happened and he's reporting it. These are things that are not physically threatening. While it's upsetting, it is no more- Also, there's reporting an inappropriate sexual relationship in the workplace through formal channels. And there's a difference, would you agree, between the vile language this gentleman used, the demeaning e-mails to town council members and other employees, than just notifying them of an inappropriate relationship. Would you agree? You're not defending these e-mails. Are you suggesting these e-mails are the appropriate manner to report an inappropriate sexual relationship? Not the language used, but the manner in which he reported it. But the fourth or fifth letter says, as you know, right? He's not alerting anybody to this incident, right? Even if that worked for the first letter. He just keeps bringing this up, and he literally says in one of them, as you know, this happened. He's not whistleblowing, right? Well, to the extent that he claims he's- Well, I think he claims that he's being targeted, and this is evidence of how she's targeting him with her subordinates. How she prefers to perform sexual acts on an employee is evidence of how he's being targeted? That she's using her subordinates to go after him. Well, he had already indicated that in the past. So the last e-mail about what kinds of acts she prefers and how she prefers it is reporting that somehow that's relevant to him being targeted? I am not claiming that that one is reporting anything. Thank you. Did you say that Kokomo was claiming that Driscoll, is that his name? Driscoll told him that this was happening? Yes, it's in one of the e-mails. So did the town question Driscoll as to whether he had- No, because he's no longer employed by the town. So we did not investigate what he was reporting. The fact that he's not employed by the town doesn't prevent you from asking him whether he said this to Kokomo. It doesn't. I don't think that, I mean, the town never took a position that the plaintiff had engaged in misconduct. They weren't investigating her for misconduct based on getting e-mails from Mr. Kokomo. So your position as you stand before us is he had every right to send these e-mails to report an inappropriate sexual relationship, and he did so in an appropriate format, as you just indicated, to the correct people, but yet the town does nothing about investigating that? I mean, isn't there a little bit of hypocrisy in that position, or am I misreading your position? I think he has the right to make a complaint, and if we look at the context of the e-mails, right, it's not just about this relationship. It's about a lot of things. I think he had the right to make that complaint. I think he had the right to make that complaint to a town manager, to a mayor, and to town council. Do I approve of the way he did it? Of course not. Do I think that's appropriate? Of course not. But he has the right to report what he claims is wrongdoing or being treated unfairly as a builder in town. I do think he has the right to do that. And I don't think we necessarily have to investigate his claims if we don't give them credence, which obviously we did not. If he's lying, if he's simply fabricating this, he has the right to do it? I think he has a First Amendment right. Whether or not it's defamatory is a different issue, but that's not for the town to stop. We are not the police of saying that something is actionable as liable because it's false. If it's false, she would have absolutely had an action. But if you're, the town doesn't have the right to stop somebody from coming and complaining about the town's conduct or its employee conduct, even if they're lying. I didn't say the town did. The question is not whether the town could stop him from doing it. The question is whether the town could do anything to ameliorate the situation, to get him to stop, which is not limited to telling him, you have to stop. You're under a legal obligation to stop. Or the question is, did the town do things that it might have done to protect its employee from illegal sexual harassment or defamation, abusive conduct? I'm not aware of any requirement that a town could, let alone should, go after a private contractor for defamation. I didn't say go after. I said, for example, take steps to determine whether what he's saying is true or a fabrication. Your Honor, with all due respect, I think that's giving credence to what he was actually saying, which the town was not doing. They were supporting the plaintiff in terms of everybody thought he was a disgruntled employee. I'm sorry, disgruntled contractor who they were not going to investigate his claims because, frankly, that would have put the plaintiff under an additional spotlight, which they had no intention of doing. All right. Thank you, counsel. Thank you. Mr. Edler, you've reserved three minutes for rebuttal. I'll be brief, I think. Just to put a couple things in perspective. Nobody thought that what Mr. Kokomo was saying was true, and counsel's correct. That's the whole point. Nobody thought it was true. It was just harassment. Well, she did have, apparently, I thought there was a concession that she had a relationship with one individual, not the two he was claiming, and there was no evidence. He also accused another female employee. The town manager of having an employee. Performing sexual favors on another male employee. There was no indication in the record that that was true. But there was an indication in the record that there was one relationship. After the person no longer worked there, not while he worked there. But I guess my point of it is. I'm sorry, you said the relationship existed when he didn't work? When he did not work there. There was no relationship while he worked for the town. They had a relationship after he was no longer there. So the relationship that broke up the marriage, that all happened after that individual left the town? Yes. The allegation that she performed oral sex on a subordinate for the purpose of getting the subordinate to go after Mr. Kokomo was absolutely false. And nobody thought it was true. So there was no reason to really investigate that. What they should have done something about was how she was being treated. And the test for that was whether the town acted reasonably under the circumstances. So what you look at is what they did. And I'll say this again and again. They did nothing to address the sexual harassment at all. And at the very end, they told her they can't do anything about this. So she quit. But we could come up with lots of different creative things that they could have done. But for purposes of summary judgment, the question is, did they take reasonable, prompt, corrective action? And they did nothing. And which made it worse. Because a lot of what they rely on were conversations they were having amongst themselves. The communication, the one communication with Mr. Kokomo's counsel was a general comment about having to treat our employees less, to treat them, to stop treating them so poorly. And his counsel did send one of the e-mails. And it's in the record, joint appendix 432 to 433. She didn't address the e-mail. She just said, here's an e-mail, amongst other e-mails, that your client sent to the town. It didn't say that it was inappropriate. It didn't say it was sexual harassment. It didn't say, tell your client to stop doing this. It just, here's one of them. That is not a reasonable action to stop sexual harassment. So you're saying, instead of just forwarding the e-mail, if they had done a proper investigation, they could have sent a formal letter to the lawyer saying, your client is engaging in sexually harassing conduct or harassing our employees. This is in violation of whatever policies there are. And we have to put limits on his communications or the extent of his communications with the town. Maybe in the future he only acts through his attorney. Maybe, maybe. But you're saying none of that, exploring all of those options, never took place. Nothing, nothing. I'm not sure that it really matters that the town, that the town people didn't, that the officials didn't believe this was true. Because there's a difference between, between accusations of bad conduct which are true and accusations of bad conduct which are fabricated and false. The law prohibits, the defamation law prohibits the latter. It doesn't prohibit the former. And whether the town believed it or not, in order to be able to accuse Kokomo of certain forms of bad conduct, the town needs to ascertain, not just to believe one thing, but to take steps to ascertain whether this is false or whether it's true. And it would have been extremely easy to ask questions, for example, of the person who was alleged to have told Kokomo this, that this was happening, whether he had done so. The town can't, can't, can't, can't claim that his conduct is illegal conduct unless they take steps to determine that it's false. I understand that from like a defamation falsehood perspective. That's what, that's what, that's one of the things that makes his conduct inappropriate, is that it's false, it's false defamation. Yeah, I get that. But this, from the sexual harassment context, what he's saying is goes to the heart of her professional reputation, right? Which is why it's so humiliating. And as everybody agrees, the last email, which we've argued on its, if you look at that last email, is part of this whole course of conduct, that that last email alone could have met the severity test because it was so outrageous. And not, I don't want to- Apart from the vulgarity of the language, if a person says, if a person says that a high official of the town is doing sexual favors for one of her subordinates in return for getting that subordinate to take adverse steps against the person who's making the complaints, that's something that's perfectly appropriate to say if it's true. I agree with that. If it's false- I don't agree with that. It's a calumny not only against the, against the person, but also against the town. That the town is being, the town itself is taking steps against- But if you, if you look at the emails, he, as, as, as I was pointing out, each email says, as you know, as you know, as you know. He was making that up, like nobody, nobody believed it. He was making it up. And the last- Everybody thinks if a judge asks you questions that you have to defend against. These questions are on your side. I know, I know. I, I, I know. I understand, but I'm like fascinated by this thing. And that, that, the, you know, the last email, I'll stop because it gets to the severe and pervasive thing. It's pervasive because it happened a number of times over time. But that last email, I think, can also be construed as severe on its own. Thank you, counsel. Thank you both. Well argued. We appreciate your time and your travels from our two out of three of our home state.